With that completed, we will now hear argument in the first case for today, which is Pinkert v. Schwab Charitable Fund. Good morning. Good morning, Your Honors. May it please the Court, Jennifer Lee appearing on behalf of Plaintiff Appellant Mr. Pinkert. I'd like to reserve two minutes for rebuttal. We'll try to help you keep your eye on the clock, okay? The district court dismissed Mr. Pinkert's claim for lack of standing because he lacked any property interest in his account assets. This was wrong for at least two reasons. First, it ignored the tax code's unique requirements governing donor-advised funds. And second, it ignored California law that recognizes that a donor can convey certain interests for tax purposes while still retaining other interests for other purposes. Let me ask you this, counsel. You mentioned the California element of this case. Do we even get to the California element of the case if we don't decide the Article III standing issue in your favor? I think that there is a — if the Court does conclude that — if the Court were to conclude that Mr. Pinkert has a property interest in his account assets, but that interest or the injury to that interest is not a traditionally recognized one under a transunion, I think the Court could still go on to analyze whether or not that property interest is sufficient under Section 5142. Right, but we need Article III jurisdiction before we decide if there's statutory standing, right? Correct, yes, absolutely. And if the Court were to conclude that Mr. Pinkert lacked Article III standing, yes, the case would not go forward in federal court, yes. This is not a case about a donation to the Salvation Army. This is about a unique charitable creature, the donor-advised fund. And the tax code codified its treatment only in 2006. Through a donor-advised fund, an account holder can fund their account today, claim a present-year tax deduction, and defer the decision of selecting the charity that will receive the money to a later time. As appellees describe, donor-advised funds are novel for decoupling the initial contribution and the ultimate distribution. So what is the basis for Article III standing here? Because he paid the money into the fund. He got the tax deduction. So what other interest does he have? So certainly when Mr. Pinkert deposited money into his account, he gave many sticks in the bundle of sticks analogy to Schwab Charitable in order to claim the tax deduction. But he still had to retain a stick, the advisory privileges, and that is required. With respect, Counsel, as I understand it from the paperwork, not only did your client give Schwab the bundle of sticks, but Schwab had the ability to change what it was going to do with respect to your client, in quotes, for any other reason. I presume in order to comply with 5142, because in order to get the deduction, the taxpayer has to be fully divested of any right in the property. Isn't that correct? It is correct that in order to claim the tax deduction, he had to surrender legal title and control. But the same section of the tax code also requires account holders to retain an advisory interest. Right. So he has that. But how has that been infringed here? His interest in his account assets is only meaningful to the extent that there is money in his account to direct. But there is a disconnect, I think. I mean, he has advisory rights. You're not alleging that Schwab has a policy of ignoring his advice, for example. His advisory rights are there, but I don't see how you've alleged those have been actually violated. The significance of the advisory rights demonstrate that Mr. Pinkert, despite having transferred title and control for tax purposes, still has a present and ongoing interest in those account assets in the form of the advisory privileges, which is a stick. Not in the assets, right? I mean, he has a right to give advice. And that's different than having a right in the assets themselves, which he already gave away. He gave away to what's effectively a charity, and he got a huge tax deduction. But his advisory interests have been injured by the diminution of his account balance. How? How? Because his advisory privileges only have meaning to the extent that there's money in his account to direct. And so if Schwab Charitable had taken all of the money from his account, I think it would be very easy to see the injury to his advisory privileges because there's simply nothing there. But with respect, counsel, my reading of the documentation is that your client said to Schwab, hey, here it is. And they had all these disclosures in there from a securities perspective. It was all disclosed. They can do whatever they want to, basically. Yes, you have an advisory right, but there's no promise in the documentation, is there, that a certain percentage of the originally contributed assets would remain indefinitely? Isn't that correct? If I'm understanding your question, Your Honor, did Schwab ever promise that he would have a minimum balance in his account? In other words, let me rephrase this. As I understand it, you're saying what happens if the whole account disappears because the stock market went to hell in the handbasket? And my question to you was, doesn't the documentation say that Schwab has complete control over the investment of the assets and there's no guarantee of what those results might be? Isn't that correct under the documentation? I don't think that's correct. The deal is not that he just gives his money to Schwab Charitable and they can do whatever they want with it after that. Doesn't the document say that, though? Schwab Charitable, in their program policies and in the investment policy statement, promised to manage the investments and the money prudently in order to grow and maximize the amount of money that account holders can distribute to charities they support. And so it's not true that they can just do whatever they want. They do have obligations to manage the account and the investments prudently and to minimize fees. Those are obligations owed. Those are obligations that they promised to the account holders in exchange for. That's the nature of the transaction. They induce donors. They say, put your money in a Schwab Charitable account. We'll invest it prudently and minimize fees so that your investment can grow and so that the amount of money that you are able to distribute to charities that you support. I get your point. If it's you or me and we go to Schwab and we just have a regular account, I get that. Then we have a clear right in connection with the fiduciary responsibility that they have. But this seems to me almost more of a derivative claim that you're asserting here, that generally speaking, you know, Schwab's got to comply with certain obligations, even though, arguably, you have no further rights other than advisory rights. What am I missing? I think the distinction is this idea that the advisory rights themselves are not meaningful. This is a stick that Mr. Pinkert has that no one else in the public has. This is a stick that he can transfer to other people. This is a stick that would go to his heirs as part of his estate if he were to die. This is a stick that Schwab Charitable describes in the program policies as meaningful, as important, as one of the key benefits of opening a Schwab Charitable account. And the donor is expected to maintain an active role in the account long after they've made the initial deposit. Well, let me ask you this. Let's just say that your client says to Schwab, I want X dollars to go to Y charity. And Schwab says, yeah, we don't think so. We don't think KKK is a good place to send this money. So we're not doing it. What are your rights? I think the question of whether or not, so I think no one disputes that Mr. Pinkert has the right, the exclusive right to make the recommendation in the first instance. But it is just a recommendation, right? Correct. It's not binding. They can do what they want. Correct. But the fact that Schwab Charitable must approve a recommendation does not negate the fact that Mr. Pinkert has the exclusive right to make that recommendation in the first instance. It might be a contingent property interest, but that's still a property interest. What's your best case to show that you have standing here? A real good case like a Supreme Court case or the Ninth Circuit or some other circuit? I think there are many cases in California law that recognize that a person that doesn't have title or ownership or control of property nonetheless has a cognizable property interest. And there are many forfeiture cases from the Ninth Circuit that recognize that. And I think the Tut Hill Road case, which is a forfeiture case, and in that case the plaintiff lacked title and control over the land. Nonetheless, he had only the mere opportunity to benefit from the future sale of that land. But with respect, Judge Seiler is asking for a case that shows Article III standing in this case. You're citing interest as an ownership in land and other things. It's a very different situation, is it not? I don't think it is because what this really is at its core is just a basic property interest. It might be a contingent property interest, but it's nonetheless a cognizable property interest that has been injured. And I think Article III standing doesn't require that Mr. Pinkert demonstrate his interest is greater than Schwab charitables. It only requires that he have some unique stake in this litigation that distinguishes him from the general public. One thing, sorry to interrupt. One thing the Supreme Court has said is we're looking for injuries that are sort of traditionally recognized in law. And here there's a whole body of law that says that someone who donates to a charity doesn't have standing to sue the charity. And you have argued there's some differences between what your client has done here and any of us just donating directly to a charity. But I guess the question for you is are those differences really material enough to take this case outside of what seems to be a pretty established body of law that you can't sue a charity for not using your money in the way you might want? I have two responses for that. First, there are common law cases that have recognized that someone with an advisory interest in a trust like Mr. Pinkert does have standing. So even someone who is – Article III standing? Has an interest in the trust. This was not in federal court. No, this was not in federal court, no. But I think the second point is that donor-advised funds are inherently different from charities. So the tax code requires that account holders be given this advisory interest. If Schwab Charitable didn't provide this meaningful advisory interest, it would lose its tax status as a tax-exempt donor-advised fund. So it is materially different. And Schwab Charitable does treat the advisory privileges as meaningful and does respect them. Mr. Pinkert has directed every distribution from his account since opening it. Let me go back to Judge Seiler's question. You have not, to the best of my recollection, named any case that says that your client has Article III standing in this situation, have you? There is not a case in the last 15 years since donor-advised funds were recognized that a person with this unique kind of interest has Article III standing. So basically you're asking us to make new law. No, I don't think that's true. This is just a new application of longstanding property law doctrines to this new donor-advised fund that was recognized by Congress only in 2006. Like my colleague Judge Brestis indicated, though, even in the state setting, there's no right to sue the charity unless you've got an express condition subsequent, if you will, where you say, I'm giving you Blackacre, but if you don't use it for Y purpose, then it comes back to me. That's a recognized exception. But you have nothing like that here, do you? This was not a donation to the Red Cross. This is a deposit into his own donor-advised fund account held in his name. If he goes onto the Schwab Charitable app, the Schwab app, you can see his checking account, his savings account, his donor-advised fund account. He's suing to enforce his interests in his own account held in his own name by virtue of interests that he exclusively has. Do you want to save the balance of your time, whatever you'd like? Sure. Thank you. Very well. All right, let's hear from counsel for Schwab. Thanks very much, Your Honor. Alan Schoenfeld for the defendants' appellees. Mr. Pinkert lacks standing under Article III in California law, and the dismissal can and should be affirmed on either or both grounds. Under Article III, Pinkert has no concrete, particularized, or legally cognizable injury. He has no economic injury. When he contributed assets to Schwab Charitable, he unequivocally and irrevocably ceded all title, dominion, and control over those funds to the charity. Counsel, as you know, at least in the appeal, Mr. Pinkert has claimed, among others, reputational and expressive injuries. Is that sufficient for Article III standing? Have you yet pled them? No. So he hasn't pled them, and I can address that. But no, neither of them, as he theorizes them, would be sufficient here. As to the reputational harm, the reputational harm is derivative of this idea that he has some direct property interest in the funds that he can direct to particular charities. But that's not the case. As I think you made clear, Judge Smith, the Schwab Charitable policies, consistent with the federal tax code treatment, deprive him of all final authority over where these funds go. They make clear in any number of ways that Schwab Charitable retains final authority, and the recommendations he's able to make are non-binding advisory recommendations, and that's it. So from your perspective, if we – I'm not saying we would, but if we were to recognize that the reputational and expressive injury interests were potentially a basis for standing, is there something that Mr. Pinkert could do to amend his complaint to satisfy Article III standing? No. I mean, I think these theories fail as a matter of law. I also think that they're inadequately pled even on their own terms. But to take the reputational injury one first, I mean, the Supreme Court has recognized in TransUnion that there are certain types of reputational harms that Article III recognizes. So reporting false information publicly is a traditional defamation-like tort that gives someone an interest that might give them standing to sue. The reputational theory that Mr. Pinkert posits here, however, is that he's got some interest in his standing in the community that's directly related to the amount of funds as to which he can exercise non-binding advisory privileges. And there's no analog in 200-plus years of Supreme Court standing, Article III case law, that recognizes any theory like that. I think the same thing is true of the expressive interest. Judge Seiler, I want to make sure I'm not cutting you off. I'm just wondering if they don't let him have any advisory rights, does he now have standing? No, I don't think he does. I mean, that's a much harder question, and that's certainly not at issue here. But there's no allegation here that Schwab Charitable has done anything other than follow his recommendations. But again, for Article III purposes, the formalities matter. And as a legal matter, all of his privileges are non-binding. If there were an allegation that Schwab Charitable just categorically refused to pick up the phone to listen to his recommendations in the first place, that would be a completely different case. It's certainly not this one. Even then, I don't think there would be Article III standing. I don't think there's any historical analog for an Article III injury in being given the opportunity to make a recommendation that everyone concedes is non-binding and purely advisory. If he has advisory rights and Schwab had a policy, a formal policy of ignoring all advice, I think he would have standing to challenge that, don't you think? I don't know the answer to that. I think it's a much harder case, and it's certainly not the one that's presented here. Again, I think using the trans-union model, I don't know what the historical analog for being given an opportunity to present that sort of advisory privilege would be. But that's not this case. He concedes that he's been given every opportunity to make his recommendations. And what this case relates to is management of charitable assets, which is the paradigmatic claim that donors have been precluded from advancing in federal and state court since time immemorial. So I think as far as—he needs standing based on the conduct that is complained of. And the conduct that's complained of in this case is mismanaging charitable assets. But I think everyone acknowledges under the code and under the policies, he's ceded absolute control, discretion, authority over. What about—it's not this case, but what about a fraudulent inducement type theory where let's just say, for example, Schwab told him, we will invest your money in one of ten funds, and that's just a part of this deal. And then they decide to invest it in some completely different funds that he had no notice of. And he comes in and says, well, wait a minute. I would never have made this donation had I known this. So, again, it's a hard case. I'm aware of one case that addresses that fact scenario. That's Seeback v. Brigham Young. And there in Utah State Court, they say that he has standing to plead a claim or standing to advance a claim based on fraudulent inducement. And so that seems to be the one model for that fact pattern. And you can certainly imagine a plaintiff coming into federal court and asserting an Article III injury there. That's, again, not this case. But what would the remedy even be for that? Because, I mean, I don't think he wants his money back here. Yeah, well, I think he acknowledges he can't get his remedy back. So that doesn't really—maybe that's a redressability issue. It's not a sort of injury in fact issue. So that's why I say these are really hard Article III problems that, fortunately, the court doesn't need to get into. But, look, if you are fraudulently induced into making a donation and you then irrevocably cede that money to a charity, maybe you have Article III standing in the injury in fact sense. I do think there's a serious redressability issue because you have irrevocably ceded. But it doesn't matter because the attorney general in a case like that or any other person who has standing to sue in state court could come after the charity and say, look, you're fraudulently inducing people, and you are required to make redress to that person. That doesn't allow a donor to come into federal court and seek restitution of the amounts that Schwab Charitable apparently paid out to Schwab & Co. to Schwab Charitable. I mean, to go back to Judge Smith's characterization, that's also a paradigmatic derivative injury that I don't think there's any standing to. How often do you know does the attorney general allow relators to bring these kind of claims? I don't know the answer to that. I can tell you that in this case the attorney general filed a motion in the district court asking to be kept apprised of developments in the case and was given notice on the docket. And so contrary to Mr. Pinkert's assertion that we're floating in a regulatory no man's land, the attorney general is aware of the allegations in this case and certainly has the prerogative to do something if he believed that the allegations had any merit. Could he designate Mr. Pinkert as a relator? Yeah. I mean, my understanding under 5142 is that the attorney general can give someone authority. I don't know that that would qualify him to bring the suit in federal court. I think there's a question about whether state KTAM actors have federal court standing. But certainly under 5142, as a matter of California state procedure, the attorney general could give relator status to a donor to sue in the name of the attorney general. I'm not aware of whether that happens or how frequently that happens. Would that be a relator interest under federal law or state law? So it would be under state law, which is why I think the Article III problems in that scenario are challenging. I don't know whether the attorney general authorizing a relator to sue in the name of the state would give someone Article III standing. But the Article III standing issue, I think, answers the question here. There is also a separate bar to his standing under California Code, Section 5142, which I'm happy to go into if the court has any questions. Would you agree that if we find there is no Article III standing, there's no point in even discussing the state claims because there still would be no subject matter jurisdiction by the federal court? I think that's right. If the court agrees with us and there's no Article III standing, I think that suffices to affirm the dismissal of the district court. And obviously, these questions under California law, I think, are clear from the case law and clear from the statute. But I'm not aware of the Ninth Circuit having addressed them previously. Are you aware of any cases where Schwab or, for that matter, anybody else that has a similar program has been accused of failing to follow, if you will, the advice given by the donor in one of these assets? I'm not. And if you're asking about the disposition of the assets to another charity, I'm certainly not aware. There's obviously the Fairbairn case where the allegation was that Fidelity Charitable failed to liquidate the assets in the manner prescribed by the plaintiffs, and Judge Corley, after a bench trial, found that none of those promises had in fact been made or redounded to the detriment of the plaintiffs. But just to address one specific question that my friend on the other side made, the analogy here is to the bundle of sticks, obviously. But the bundle of sticks, each of those sticks, is still some kind of possessory or ownership interest in the property at issue. It is rents or licenses or easements or usufructs. There is nothing possessory or ownership-ish or control-related in the privilege that Mr. Pinker alleges he retained here. It is purely advisory. It is purely nonbinding. And so the notion that that falls within the traditional bundle of sticks respected by California property law or any state's property law, I think is completely unfounded based on, again, hundreds of years of property law. Is there any daylight, if hypothetically there were Article III standing, is there any situation in which there would be Article III standing here but not statutory standing under California law? It's a good question. I've thought about this one quite a bit. It's hard to know based on what the court might do on the Article III standing. I could imagine the court finding some type of expressive interest that might suffice under Article III that doesn't qualify as a contractual property or reversionary interest in the asset subject to the trust. I don't think that theory is viable here, and I don't think it's pled here. But just to answer your question directly, I think I can probably imagine a scenario where there is something that suffices for Article III standing, but the claim would then falter under 5142. And if you agree that there might be an expressive interest that could qualify, how could the plaintiffs in this case plead the cause of action to that effect? It's a hard question to answer because it's sort of counterfactual. I don't think there is an expressive interest here for the following reason. Plaintiff points to the sort of campaign finance cases and says the Supreme Court has recognized a First Amendment right in donating to political causes. That's certainly right, and I don't know that any of them addresses Article III standing, but you can imagine what there is a government prohibition directly regulating someone who says I want to give X amount of dollars to X political campaign, and it says you can't. Of course there would be Article III standing to challenge that sort of government action here. But there's no theory under which a party that has only nonbinding advisory privileges can claim an expressive interest in the constitutional sense. I think TransUnion explicitly forecloses that sort of venture. Has there been any case at all on that, that a donor in an advisory position has some kind of standing, or is there any other organization that does? No, I don't think so. There's certainly no case addressing Article III standing to assert advisory privileges. Judge Corley obviously in Fairbairn found standing under this California common law standing. I don't think that case is applicable here, and it's easily distinguishable, but she didn't address Article III standing in that case. So I'm not aware of any case that would recognize or provides a historical analog for recognizing that sort of expressive interest in just exercising your advisory privileges. If the Court has no further questions, I'm happy to go. Any other questions by my colleague? I think not. Thank you, Your Honor. Thank you. Very well. So, Ms. Lee, you have some time remaining. Thank you, Your Honors. I would like to go back briefly just to a question that Judge Bress raised. And he asked, my friend, if the Schwab charitable just refused to pick up the phone to even hear Mr. Pinkert's recommendations, if he would have standing. And I think that if the Court recognizes that an injury to that interest is cognizable, then I think the question then becomes, what is the connection? I think that acknowledges that the advisory rights are meaningful and are cognizable as an interest in the first instance. And I think then the question is, what is the connection between those advisory rights and the fiduciary breaches that are alleged in the complaint? And the connection is that, as I explained earlier, that the advisory rights only have meaning to the extent that there's money in his account. And courts have recognized that equitable property interests can be injured when the underlying property is itself injured. And so, in the Tut Hill Road case, when land that a man didn't have any possessory or ownership interest in was seized, he had standing because he had the opportunity to benefit from a future sale. And that interest was speculative. It was contingent. It might never arise. But nonetheless, the Court found that that contingent speculative interest in that underlying property was enough to give him standing for Article III. Well, let's talk about the speculative interest here. If I understand it correctly, your client is claiming that if the results in the market are not to his liking, that he'll have to contribute more money to, if you will, maintain the reputational interest and so on, what the charities think they're going to get. If you were given the right to amend your complaint, how could you plead a cause of action? Has your client actually increased the amount given to the or donated to this fund in order to make up for lost money? Has that actually happened? I don't know the answer to that right now, but I would like to clarify that the cause of action is not, or his complaint or grievance, is not that he is unhappy with the performance of the investment options. The cause of action is that Schwab promised to manage the investments prudently. They were supposed to select the best and cheapest. I understand that, but what I'm trying to get back to is he, if I understand it, he said he'd have to contribute more money to reach the same quantum of gift that he originally contemplated. So my question to you is, has he actually done that at this point? Standing here right now, I don't know the answer. Well, let's say he hasn't. Can you plead a cause of action based upon what he might do in the future? With respect to that one interest, that one claim, I don't think that he could, as a speculative matter, claim an injury to that interest if he hasn't, in fact, contributed more. Very well. Let me ask my colleagues. Your time is up. Well, let me ask my colleagues whether either has additional questions. I think not. Well, we thank both counsel for your argument. The case just argued is submitted, and as I mentioned earlier, the Court is going to take a very brief recess, and if you'll let us know when we're ready for the next case, okay? Thank you, Your Honor. Thank you, Bo.
judges: Siler, SMITH, BRESS